FILED
2015 Oct-19  PM 04:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE  DIVISION

| | | |
|---|---|---|
| **CODY ETHERTON, et. al.,** | ] | |
| | ] | |
| **Plaintiffs,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | **CV-14-BE-1832-M** |
| **CITY OF RAINSVILLE, et. al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

This zoning case—involving a chicken farm and alleging violations of federal constitutional rights, among others— is before the court on Defendants' "Motion to Dismiss Amended Complaint," asserting that the complaint is not all it's cracked up to be because it neither states a legal claim nor follows the Federal Rules of Civil Procedure, and further,  that allowing the case to continue would be akin to hatching rooster eggs, i.e., wasting time and resources.  (Doc. 18).   The *pro se* Plaintiffs filed a responsive brief, putting up a squawk (doc. 24); and Defendants filed a hard boiled reply (doc. 28) with further evidentiary material (doc. 29).  With the court's permission, the Plaintiffs filed a sur-reply, entitled "Memorandum of Law and Understanding," which stated, among other things, that "the applicable pecking order must be followed by the City."  (Doc. 30-1, at 8).  After the Plaintiffs again amended the complaint with the court's permission to add the value of the structures involved in chicken farm use (doc. 35), the Defendants filed a supplemental brief (doc. 37).  This matter has received extensive

briefing and ample incubation.

For the reasons stated in this Memorandum Opinion, the court FINDS that the Defendants' motion to dismiss is due to be GRANTED.

## I.  PROCEDURAL HISTORY

On September 26, 2014, the Plaintiffs filed this lawsuit, their hackles raised, challenging the zoning amendment and the City and City officials' application of it to their chicken farm usage.  (Doc. 1).   After the Defendants filed a motion to dismiss (doc. 9) the original complaint and filed a supporting brief (doc. 10), the Plaintiffs filed the Amended Complaint (doc. 16) with permission of the court (doc. 15).   The Plaintiffs' Amended Complaint contains the following Counts[1]: 1. Trespass upon & Deprivation of the Right to Contract under the U.S. Constitution and the Alabama Constitution;  2. Trespass upon & Deprivation of the Right to Equal Enforcement of the Law;  3.  Conspiracy to Interfere;  4.  Neglect to Prevent;  5. Breach of Fiduciary Duty;  6.  Constructive Fraud;  7. Breach of Contract (asserting the breaking of the Oath of Office to uphold state and federal constitutions);  8. Trespass upon & Deprivation of the Right against Taking Private Property without Just Compensation; 9.  Intentional Interference with Contractual Relationship; and 10.   Intentional Interference with Business Relationship.  The Defendants are the City of Rainsville, Alabama; Nick Jones, the City's Mayor; City Council Members Melissa Ledbetter, Joseph Graham, David Holt, Roger Lingerfelt, and Brandon Freeman; and Richard Gibson, the City's Revenue and Zoning Officer.

On August 13, 2015, the court entered an "Order Requiring Clarification" (doc. 32),

---

[1] Although the Defendants' brief refers to 11 counts, they must have been referring to the original complaint (doc. 1) and not the amended version (doc. 16); the amended version only has 10 counts.

noting that the zoning ordinance in question contains two sections that could apply to the Plaintiffs' chicken farm use: § 5-2-2 and § 5-2-4, depending upon the value of the structures in the chicken farm use at the Kain Avenue property as of the time of the 2001 amendment to Ordinance 3-19-01-B.  The court asked the Plaintiffs to clarify on or before August 24, 2015 the value of the structures involved in chicken farm use as of the enactment of the 2011 zoning amendment.  The Plaintiffs filed a response, stating, among other things, that the five poultry houses on that property involved in chicken farm use each exceeded the value of $100,000, and that § 5-2-4 would thus apply.  (Doc. 33).

The court entered an Order (doc. 34) directing the Plaintiffs to amend their pleading to reflect certain information contained in the response, and allowing the Defendants to file a supplemental brief responding to that information.  The Plaintiffs amended their complaint for a second time (doc. 35), stating, among other things, that five poultry houses existed on the Kain Avenue property at the time of the 2001 ordinance amendment and that the replacement value for each poultry house at that time in 2001 exceeded $125,000.  In addition to the "Amendment to Petition," filed in accordance with the court's order to do so,  the Plaintiffs also filed, without permission, a "Request for Judicial Notice" attached to the Amendment.  (Doc. 35, at 2-13).  The court struck the section of the document entitled "Request for Judicial Notice."  (Doc. 36). Defendants filed a supplemental brief responding to the latest "Amendment to Petition."  (Doc. 37).

## II.  JUDICIAL NOTICE

Defendants presented a certified copy of the 1983 Zoning Ordinance and Amendments to which Plaintiffs filed no objection.  The court takes judicial notice of the Zoning Ordinance

and Amendments as a certified public record. *See First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.,* 482 U.S. 304, 326 n. 6 (1987) (stating that "[i]t is proper to take judicial notice of the ordinance."). The Amended Complaint attaches and incorporates by reference the 2001 Zoning Ordinance Amendment, and thus, the court may consider that document in any event; however, the court takes judicial notice of the *complete* Zoning Ordinance as amended in addressing this motion.  The Zoning Ordinance was also amended in 1989, 1992, 2002, 2005, 2006, 2007 and 2009, but those amendments are irrelevant to the claims in this case. The 2010 Amendment  changing the Special Exception use fee from $35.00 to $200.00 is relevant and referenced in this Opinion.   (Doc. 29-2, at 17, 26-30).

The court also takes judicial notice of the job that each individual Defendant holds with the City, to the extent those positions are not identified in the amended pleadings.

### III. FACTS

This case involves the application of a Zoning Ordinance, as amended, to a chicken farm. The Plaintiff claims that the chicken farm use is grandfathered-in as a Non-Conforming Use that runs with the land upon transfer of ownership.  The City claims that the chicken farm use is not a permitted use but can be permitted through the Special Exception process, as further discussed below.

#### A.  Rainsville Zoning Provisions

On April 23, 2001, the City Council of Rainsville, Alabama brooded for a while about the changing municipal zoning needs and then hatched Zoning Ordinance 3-19-01-B.  That Ordinance, among other things, amended the following sections of the previous  "Zoning Ordinance of the City of Rainsville, Alabama" adopted in 1983:  § 4-8 entitled "AG

Agricultureal [sic] District," and § 5-2 entitled "Non-Conformities."  The Amendment to the Ordinance is what eventually ruffled some feathers and caused this lawsuit. It changed chicken farming in the agricultural zone from a permitted use to a prohibited use subject to a Special Exception procedure, which, if Special Exception status is granted to applicants, allows the chicken farm to exist with certain limitations and safeguards.[2]  As discussed subsequently in detail, the amendment also provided for grandfathering-in existing uses, such as chicken farms in existence when the amendment was enacted in 2001.

In the original Zoning Ordinance, § 10-2-52 provided the definition of "Special Exception," which remains unamended and which stated as follows:

> A Special Exception is a use that would not be appropriate generally or without restriction throughout a zoning division or district but which, if controlled as to number, area, location, or relation to the neighborhood, would promote the public health, safety, welfare, morals, order, comfort, convenience, appearance, prosperity, or the general welfare.  Such uses may be permissible in a zoning classification or district as a Special Exception if specific provision for such a Special Exception is made in this Ordinance.  (For procedure in securing Special Exceptions, see Subsection 7-4-3).

(Doc. 29-1, at 69).   Section 7-4-3[3], which also remains unamended except for the amount of

---

[2]   Section 4-8-1 of the original Zoning Ordinance, entitled "Permitted Uses," included among the uses "Agricultural uses including the raising of crops, livestock and poultry and other similar uses."  (Doc. 29-1, at 23-24).   The 2001 amendment to § 4-8-1 deleted from that sentence "poultry and other similar uses" so that the relevant bullet point under "Permitted Uses" now reads:
> Agricultural uses including the raising of crops and livestock.  There is specifically prohibited as a permitted use hog farms, chicken farms, feed lots for cattle and other similar types of farming where animals are concentrated in a relatively small area or housed within a building.

(Doc. 16-1, at 8).
The 2001 amendment to § 4-8 also contained a provision designated as "4-8-2 Special Exceptions" that included, among others, the following: "Hog farms, chicken farms and feed lots for cattle and other similar types of farming where animals are concentrated." (Doc. 16-1, at 8).

[3]   Special Exception; Conditions Governing Applications; Procedure.
The Board of Adjustment is empowered to hear and decide only such Special Exceptions as it is specifically authorized to pass on by the terms of this Zoning Ordinance; to decide such questions as are involved in determining whether or not a Special Exception should be granted; to grant Special Exceptions with such conditions and safeguards as are reasonable and appropriate under this Zoning Ordinance; or to deny Special Exceptions when not in harmony with the purpose and intent of of this Zoning Ordinance.  A Special Exception shall not be granted by the Board of Adjustment unless and until:

Special Exception fee, set out the procedure for obtaining a Special Exception, allowing the Board of Adjustment to grant or deny requests for Special Exceptions, sometimes with appropriate conditions and safeguards, upon written application; the payment of a $200 fee;[4] written notice to all owners of adjacent property; and a public hearing.   Section 7-5 is a provision providing for appeals from zoning board decisions, requiring appeals within 15 days of the decision by written notice of appeal with the Zoning Board of Adjustment.

Section  5-2-6 of the original 1983 Zoning Ordinance, entitled "Uses under Special Exception Provisions not Non-Conforming Uses," provided:  "Any use which is permitted as a Special Exception in a district under the terms of this Zoning Ordinance shall not be deemed a

---

1. Written Application.  Written application for Special Exception is submitted indicating the Section of the Zoning Ordinance under which the Special Exception is sought and stating the grounds on which it is requested.

2. Fee.  A fee of Two Hundred Dollars ($200.00)  shall be paid to the City Clerk and/or the Administrative Officer of the City of Rainsville, Alabama to cover the costs and expenses of the application to the Board of Adjustment for a special exception use.  In addition, the applicant shall submit with each application a list of names and addresses of all record property owners adjacent to the exterior boundary of the subject property.  Said list shall be current and certified by a professional engineer, an attorney, a registered surveyor, an abstractor, or an official of the DeKalb County Tax Assessor's Office.

3. Notice of Public Hearing.  Upon receipt of said written application, fee, and list, notice of public hearing shall be given in accordance with Section 9-4 of this Zoning Ordinance.  In addition, notice of public hearing shall be given by mailing written notice by the Chairman of said Board to all owners of adjacent property.  Such notice shall contain:

(a) Legal description of the property and the street address of approximate location of the City of Rainsville;

(b) Present zoning classification of the property and the nature of the Special Exception requested;

(c) Date, time, and place of hearing.

Said written notice shall be mailed not less than two (2) weeks before the meeting of the Board.  A copy of the published notice may be mailed in lieu of written notice.

4. Public Hearing.  The public hearing shall be held by the Zoning Board of Adjustment.  Any party may appear by agent or attorney.

5. Findings.  Before any Special Exception shall be issued, the Zoning Board of Adjustment shall make a specific finding that it is empowered under the Section of this Zoning Ordinance to grant the Special Exception and the Special Exception will not adversely affect the public interest.  Before any Special Exception shall be issued, the Zoning Board of Adjustment shall further make a determination that the specific rules governing the individual Special Exception, if any, have been met by the petitioner and that satisfactory provision and arrangement has been made concerning the following where applicable:

* * *

(h) General compatibility with adjacent properties and other property in the district.

6. Conditions and Safeguards.  In granting any Special Exception, the Zoning Board of Adjustment may prescribe appropriate conditions and safeguards in conformity with this Zoning Ordinance. . . .

7. Denial.  If the Zoning Board of Adjustment shall deny a Special Exception, it shall state in its record its reasons for doing so ....

(Doc. 29-1 at 50-52).

[4] This provision was amended in 2010 to change the fee from $35.00 to a more substantial fee  of  $200.00.

non-conforming use in such district, but shall without further action, be deemed a conforming use in such district." (Doc. 29-1, at 31).

The part of the amended Zoning Ordinance over which the Ethertons cry fowl . . . er, *foul*, and challenge as violative of their federal rights is in the section addressing Non-Conforming Uses.[5]  The amended Ordinance provided for grandfathering-in uses, such as the chicken farm, that were lawful and existing at the time of the change in zoning.  These grandfathered-in uses, called Non-Conforming Uses,  are allowed to continue "as is" even though they do not conform to the current zoning restrictions.   The Ethertons claim that the City violated their rights either in enacting an unconstitutional Non-Conforming Use provision, or in ignoring the relevant Non-Conforming Use provisions altogether, or in mis-applying them.

The Non-Conforming Use provisions are divided into two categories: Non-Conforming Use of Land—§ 5-2-2; and Non-Conforming Use of Major Structures, or Major Structures and

---

[5] Section 5-2 of the original 1983 Zoning Ordinance  was entitled "Non-Conformities" and provided in relevant part as follows:

> Within the districts established by this Zoning Ordinance or amendments that may later be adopted, there may exist (a) lots, (b) structures, (c) uses of land and structures, and (d) characteristics of use which were lawful before this Zoning Ordinance was adopted or amended, but which would be prohibited, regulated, or restricted under the terms of this Zoning Ordinance or future amendments.  It is the intent of this Zoning Ordinance to permit these non-conformities to continue until they are voluntarily removed or
>
> removed as required by this Zoning Ordinance was adopted or amended, but which would be prohibited, regulated, or restricted under the terms of this Zoning Ordinance or future amendments.  It is the intent of this Zoning Ordinance to permit these non-conformities to continue until they are voluntarily removed or removed as required by this Zoning Ordinance, but not to encourage their continuance.  It is further the intent of this Zoning Ordinance that non-conformities shall not be enlarged upon, expanded, intensified, or extended, nor be used as grounds for adding other structures or uses prohibited elsewhere in the same district.
>
> Non-conforming uses are declared by this Ordinance to be incompatible with permitted uses in the districts involved.  A non-conforming use of a structure, a non-conforming use of land, or a non-conforming use of a structure and land in combination shall not be extended or enlarged after the effective date of this Zoning Ordinance or its amendment by attachment on structures or premises of additional signs intended to be seen from off the premises, or by the addition of other uses of a nature which would be prohibited generally in the district involved. . . .

(Doc. 29-1, at 28).  Section 10-2-44 of the original Zoning Ordinance defined "Non-Conforming Use" as "[a]ny lawful use of land, building or structure existing at the time of adoption of the Zoning Ordinance, which does not conform with the regulaitons [sic] of the district in which it is located."  (Doc. 29-1, at 68).

Premises in Combination— § 5-2-4.  As discussed subsequently, the second category is relevant

in this case, and that provision, also amended in 2001, reads as follows:

> Non-conforming Use of Major Structures, or of Major Structures and Premises in Combination.  Where, at the effective date of adoption or amendment of this Zoning Ordinance, a lawful use of structures, or of structures and premises in combination exists involving an individual, permanently-fixed structure with a replacement cost at or exceeding $1,000 or a combination of permanently-fixed structures with a replacement cost at or exceeding $4,000, such use may be continued so long as it remains otherwise lawful provided:
> [(a) (c) & (d) provide that the non-confirming use cannot be continued where the structures devoted to a non-conforming use are enlarged or destroyed or the non-conforming use is resumed after being discontinued for a period of more than 12 months. No allegations in the pleadings indicate that these sub-sections apply.]
> (b) Change in Tenancy or Ownership.  There may be a change in tenancy, ownership, or management of a non-conforming use provided there is no change in the nature or character of such non-conforming use.

(Doc. 29-2, at 29-30).

Although the Plaintiffs' pleadings raise the constitutionality of the other category of

Non-Conforming Uses, § 5-2-2[6], entitled "Non-Conforming Uses of Land," that provision did

not apply to the Kain Avenue property because the value of the chicken farm use exceeded its

limits of $1,000 per single permanently-fixed structure or $4,000 for a combination of

---

[6] Section 5-2-2 Non-Conforming Uses of Land.   Where, at the effective date of adoption or amendment of this Zoning Ordinance, a lawful use of land exists which would not be permitted by the regulations imposed by this Zoning Ordinance, and where such use involves no individual, permanently-fixed structure with a replacement cost exceeding $1,000 and no combination of permanently-fixed structures with a replacement cost exceeding $4,000, the use may be continued so long as the current owner owns said land and it remains otherwise lawful, provided:

(a)      Enlargement, Increase, Intensification, Alteration.  No such non-conforming use shall be enlarged, increased, intensified, or extended to occupy a greater area of land than was occupied at the effective date of adoption or amendment of this Zoning Ordinance.

(b)      Discontinuance/Transfer.  If any such non-conforming use ceases for any reason (except when governmental action impedes access to the premises) for a period of more than twelve (12) consecutive months or if the current owner sells, transfers or conveys such land, then any subsequent use of such land shall conform to the regulations specified by this Zoning Ordinance for the District in which such land is located.  A transfer of ownership by death or inheritance shall not disallow the heir from using the land as it had been used by the ancestor.

(c)      Subdivision or Structural Additions.  No land in non-conforming uses shall be subdivided, nor shall any structures be added on such land, except for the purposes and in a manner conforming to the regulations for the district in which such land is located.

(Doc. 16-1, at 7).

permanently fixed structures.  Another difference between § § 5-2-2 and 5-2-4 is that § 5-2-2 provided that non-conforming uses falling within its limits would cease upon transfer of ownership except transfer by death or inheritance, whereas § 5-2-4 provides that the non-conforming use would continue upon transfer of ownership.

**B.  Kain Avenue Chicken Farm**

Before April 23, 2001, when the City Council of Rainsville passed Ordinance 19-01-B, Harold and Kathy Owens owned and operated a cattle and poultry farm on private property at 421 Kain Avenue in Rainsville's agricultural district.  The Kain Avenue property included five poultry houses, each of which exceeded the value of $100,000.  After the passage of the 2001 amendment to the ordinance, the Owenses continued operation of the cattle and poultry farm as a non-conforming use.

In June of 2005, Plaintiffs Cody and Hope Etherton purchased the Owens property on Kain Avenue, including all title, covenants, and rights to the use and possession of the property.  Neither the City nor any of the Defendant City Officials raised objections to the conveyance.  The Amended Complaint does not reflect whether, at or around the time of this purchase, the Owenses and/or Ethertons spoke with any of the Defendants,  Rainsville's Revenue and Zoning Officer, or any City of Rainsville official regarding the Ethertons' ability to continue raising poultry, regarding how zoning affected that ability, or regarding the application of the zoning ordinance provisions for Special Exceptions and non-conforming uses.  The Amended Complaint also fails to reflect whether the Ethertons were aware when they purchased the property that the poultry farm operated as a non-conforming use.  The Amended Complaint does reflect, however, that, after purchasing the property on Kain Avenue, the Ethertons continued to

operate the chicken farm and never applied for a Special Exception nor did the City require them to do so to operate the chicken farm themselves.  The Amended Complaint does not state that the Ethertons enlarged or discontinued the chicken farm use during their ownership of it, and does not state that the chicken farm was destroyed and rebuilt during that period.

In January of 2014, the Ethertons decided to sell their Kain Avenue property and feather their future nest.  Initially, they did not advertise it on the open market because neighbors contiguous to their property, Daryl and Grant Johnson, expressed an interest in the property and were serious enough about purchasing to obtain an intent-to-contract letter from Pilgrim's Pride Poultry Company.  However, for reasons unknown, the Johnsons stopped their attempts to purchase the Ethertons' farm.  As noted subsequently, the Ethertons were convinced that a conspiracy existed that involved the Johnsons.

About June of 2014, Dale and Sherri Jones inquired about purchasing that property. After the Joneses received a letter of intent to contract from Pilgrim's Pride Poultry Company and a loan contract from Alabama Farm Credit, the Ethertons signed an agreement to sell the Kain Avenue property to the Joneses for $850,000.00.[7]   Not wanting to count their chickens before they hatched, the Joneses contacted the City of Rainsville regarding the requirements to continue conducting chicken farm operations.  In mid-July of 2014, Richard Gibson, Revenue and Zoning Officer for the City of Rainsville, informed the Joneses that they must comply with specific instructions prior to commencing poultry operations, including obtaining neighbors' signature on consent forms for the operation of a poultry farm.  After this meeting with Gibson, the Joneses initially told the Ethertons that they were no longer interested in purchasing the

---

[7] This figure includes all of the Kain Avenue property, not just the structures relating to chicken farming.

farm, but on July 20, 2014, Sherri Jones contacted the Ethertons via text message, and notified them that the Joneses were renewing efforts to purchase the farm.

On July 24, 2014, Sherri Jones emailed Hope Etherton and advised her that the City was refusing to shake a tail feather in the process; she wrote that the City was continuing "to put us off." According to Jones, the City was delaying the purchase in two ways: requiring signed consent forms from the neighbors but not supplying the consent forms; and also requiring the Joneses to meet with the zoning board, which could not meet for another 3 weeks. Sherri Jones concluded that she and her husband "don't think we have the right pull to get anything done." (Doc. 16-1, at 12). A few days later, on July 29, 2014, Gibson called Sherri Jones and advised her that the Joneses would have to hire an attorney and pay $200 to make an application to the zoning board for the Special Exception, and he characterized the process for zoning approval as "very difficult" if anyone raised opposition to their application. (Doc. 16-1, at 11).

On July 29, 2014, after the Joneses told them they were, in effect, chickening out of the purchasing process, the Ethertons released the Joneses from the contract.

Buddy and Tony Goolesby also expressed interest in purchasing the Ethertons' farm, and their experience in dealing with the City as they explored that potential purchase is detailed in Tony Goolesby's affidavit, discussed subsequently in this Memorandum Opinion. The Goolesbys decided not to purchase the Etherton farm.

On August 6, 2014, Cody Etherton met with City Mayor Nick Jones and City Clerk, Tammy Gregory, to discuss zoning and the Etherton farm. Etherton understood from his discussion with Jones and Gregory that, for the City Zoning Board to determine whether subsequent purchasers of the chicken farm could operate it as a chicken farm, the Ethertons or

their purchasers would need to go through the Special Exception process and get approval for

the subsequent purchasers to do so.  Jones and Gregory gave the Ethertons a document entitled

**"PROCEDURE FOR APPLYING FOR SPECIAL EXCEPTION UNDER ZONING**

**ORDINANCE OF RAINSVILLE, ALABAMA"** which provided that applicants must tender a

2-page written application together with a $200 fee, and also must attend a public hearing before

the Zoning Board of Adjustment after published notice and mailed notice to the farm's

neighbors regarding the public hearing.  The published notice must occur more than 15 days

before the hearing, and be mailed notice to neighbors of adjacent property must occur at least

two weeks prior to the hearing.  The document indicated that the Zoning Board of Adjustment

had the power to grant or deny the Special Exception and to require conditions and safeguards

along with any grant of the Special Exceptions.  (Doc. 16-1, at 18).

On August 19, 2014, Cody and Hope Etherton submitted to the City, Mayor Jones, the

City Council, and Gibson a notarized document providing a chronological statement of facts

regarding the zoning problems they experienced with attempting to sell the farm, which they

characterize as notice to all parties of the violations of the Ethertons' rights.  (Amend. Compl.

Doc. 16-1, at 22-26).  The Ethertons followed up this notice with a letter attaching a formal

"public records request" on September 2, 2014, and an affidavit of Tony Goolesby.  Amend.

Compl. Doc. 16-1, at 14-17 (Goolesby aff.);  36-39 (Goolesby aff.); 40-41 (letter attaching

public records request and Goolesby aff.); 42-44 (public records request).

That affidavit said that Buddy and Tony Goolesby had decided to purchase the Etherton

farm and had contacted Pilgrim's Pride Poultry Company, the entity that held the Ethertons'

chicken growing contract on the farm.  Pilgrim's Pride gave Buddy Goolesby a letter of intent to

place poultry with the stipulation that the poultry houses would need renovations.  The Goolesbys then contacted Gibson on behalf of the City of Rainsville, who told him that the City would not allow the renovation of existing poultry houses, the erection of new poultry houses, or any higher poultry capacity to be placed on the farm,  and that they would need to go through the Special Exception process to obtain permission to conduct any poultry operations after the sale.  When Tony Goolesby asked if the poultry farm was not a use grandfathered-in, Gibson said that the grandfather clause applied only to the Ethertons and would not apply to purchasers of the farm, who would have to go through the Special Exception process to continue chicken farm operations.

The Goolesbys initially decided to pursue the Special Exception process because they "were intent upon purchasing the Etherton Farm."  (Goolesby Aff. attached to Amend. Compl. Doc. 16-1, at 38 ).  However, they learned that they must pay a fee to apply for the Special Exception and appear before a Special Exceptions Committee with no guarantees that their application would be successful.  The Goolesbys "agreed that the City of Rainsville had gotten so involved in the transaction that we needed to back away. . . [and] without the guarantee that we would be able to raise poultry, we could not justify expending any more of our resources without a guarantee of return with a profit."  *Id.*

After receiving the notarized statement of facts, and possibly Tony Goolesby's affidavit, Mayor Jones requested a meeting with the Ethertons to try to work out the matter together.  On September 3, 2014, Cody Etherton met with Gregory and Jones at the home of Rodney Etherton, who is apparently Cody Etherton's father.  Jones offered to stick his neck out and help negotiate the sale of the farm, and Jones pleaded with Cody Etherton to apply for the Special Exception

13

use.  Because the request to apply for Special Exception occurred in the context of the

Ethertons' *selling* the property and because of the continued references in the Amended

Complaint to City officials saying the Ethertons were grandfathered-in but the subsequent

purchasers were not, the application appeared to be meant to determine the *subsequent*

*purchasers'* right to continue the chicken farm.  Cody Etherton refused to submit an application

for a Special Exception because he was cock-sure that such an application would be a waiver of

rights that he viewed as running with the land: the right to continue to operate the chicken farm

without a Special Exception.

On September 12, 2014, the Ethertons wrote another letter to the City of Rainsville,

Mayor Jones, Gibson, and City Council Defendants, stating that they had not received a written

response from the August 19 communication and its Statement of Facts, requesting a response

within five days, and referring to their public record request.  Assuring the City that they were

not playing chicken, the Etherthons promised that they would file a formal claim if "a timely

and equitable resolution is not forth coming."  (Ex. 10 to Amend. Compl. Doc. 16-1 at 45).  On

September 17, 2014, the Ethertons sent Defendants another letter submitting their proposed

complaint for damages.

On September 26, 2014, the Ethertons filed this lawsuit, suing the City of Rainsville as

well as other individual City officials whom they considered bad eggs:   Mayor Jones; Zoning

Officer Gibson; and members of the City Council for the City of Rainsville, Brandon Freeman,

Joseph Graham, David Holt, Melissa Ledbetter, and Roger Lingerfelt.

### C.  Allegations Regarding Alabama Farm Credit and other Non-Parties

In the sections entitled  "Conspiracy against Rights" and "Conflict of Interest," the

Ethertons assert that non-parties were conspiring with Defendants to obstruct prospective purchasers' ability to continue operating a chicken farm on the Kain Avenue property, and thus, to encourage the property's foreclosure and sale at a reduced price.  The alleged conspirators were Alabama Farm Credit, the entity holding the mortgage on the Ethertons' Kain Avenue property;  and two brothers-in-law of Zoning Officer Gibson.  One brother-in-law, Daryl Johnson, lived on land contiguous to the Ethertons' chicken farm and had expressed interest in the farm.  Another brother-in-law, Larry Don McGee, was on the board at Alabama Farm Credit.

To support this conspiracy theory, the Amended Complaint contained the following facts: (1) Johnson had expressed an interest in purchasing the Ethertons' property that was serious enough to obtain a letter of intent to contract from Pilgrim's Pride Poultry Company; (2) Alabama Farm Credit denied the Ethertons' request for an interest-only payment of the mortgage; (3) Alabama Farm Credit ordered appraisals of the Etherton land and those appraisals had "systematic fundamental flaws" that show the property worth $100,000 less than the mortgage indebtedness of $850,000; (4) Alabama Farm Credit charged the Ethertons for the appraisal without their authorization and failed to send copies of the appraisal to the Ethertons; (5) Alabama Farm Credit was aware that Dale and Sherrie Jones had a contract with the Ethertons to purchase the farm and a letter of intent from Pilgrim's Pride Poultry Company; (6) Alabama Farm Credit effected foreclosure on the Ethertons' Kain Avenue property; and (7) Alabama Credit Administration initiated an investigation, still on-going at the time of initiating this litigation, into the Ethertons' complaint of unlawful activity, suggesting, from the Ethertons' point of view, the substantiality of the Ethertons' claim.

15

All of the Ethertons' dealings with Alabama Farm Credit were with its President, Greg Copeland, and did not involve board member Larry Don McGee.  Further, the *facts* alleged do not reflect any notice to McGee of the Alabama Farm Credit activities and decisions involving the Ethertons' property nor do the *facts* alleged reflect his involvement behind the scenes.  They do reflect that the Ethertons advised Alabama Farm Credit, but not the Alabama Farm Credit board members, of the existence of the sales contract between the Joneses and the Ethertons and of the Joneses' letter of intent to contract with Pilgrim's Pride, because this information aided them in mortgage negotiations.   The facts asserted show no knowledge or involvement of Johnson or Gibson regarding these alleged activities of Alabama Farm Credit.  The facts do not reflect who bought the Ethertons' property after foreclosure, so the court does not know if Daryl Johnson was the purchaser.

## IV.  STANDARD OF REVIEW

A Rule 12(b)(6) motion to dismiss attacks the legal sufficiency of the complaint.  The motion to dismiss in the instant case attacks the sufficiency of the Second Amended Complaint filed by a *pro se* Plaintiff.  Although the court is required to show leniency to a *pro se* plaintiff's pleadings, his complaint is still "subject to the relevant law and rules of court, including the Federal Rules of Civil Procedure."  *Moon v. Newsome,* 863 F.2d 835, 837 (11th Cir. 1989).  *Pro se* complaints must "comply with the procedural rules that govern pleadings."  *Beckwith v. Bellsouth Telecomms. Inc.*, 146 F. App'x. 368, 371 (11th Cir. 2005).

Generally, the Federal Rules of Civil Procedure require only that the complaint provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Conley v. Gibson*, 355 U.S. 41, 47

16

(1957) (quoting Fed. R. Civ. P. 8(a)).  A plaintiff must provide the grounds of his entitlement, but Rule 8 generally does not require "detailed factual allegations."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley*, 355 U.S. at 47).   It does, however, "demand[ ] more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal* 556 U.S. 662, 678 (2009).   Pleadings that contain nothing more than "a formulaic recitation of the elements of a cause of action" do not meet Rule 8 standards nor do pleadings suffice that are based merely upon "labels or conclusions" or "naked assertions" without supporting factual allegations.  *Twombly*, 550 U.S. at 555, 557.

The Supreme Court explained that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting and explaining its decision in *Twombly*, 550 U.S. at 570).  To be plausible on its face, the claim must contain enough facts that "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  Although "[t]he plausibility standard is not akin to a 'probability requirement,'" the complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Id*.   "Where a complaint pleads facts that are merely consistent with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*.  (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has identified "two working principles" for the district court to use in applying the facial plausibility standard.  The first principle is that, in evaluating motions to dismiss, the court must assume the veracity of well-pleaded factual allegations; however, the court does not have to accept as true legal conclusions even when "couched as [] factual

17

allegation[s]" or "threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements." *Iqba*l, 556 U.S. at 678.   The second principle is that "only a complaint

that states a plausible claim for relief survives a motion to dismiss." *Id*. at 679.   Thus, under

prong one, the court determines the factual allegations that are well-pleaded and assumes their

veracity, and then proceeds, under prong two, to determine the claim's plausibility given the

well-pleaded facts.   That task  is "context-specific" and, to survive the motion, the allegations

must permit the court based on its "judicial experience and common sense. . . to infer more than

the mere possibility of misconduct." Id.   If the court determines that well-pleaded facts, accepted

as true, do not state a claim that is plausible, the claim must be dismissed.   *Id.*

## V.  DISCUSSION

The court notes, preliminarily, that the motion to dismiss addresses a *pro se* amended

complaint that is over fifty pages long with over one hundred pages of exhibits and attachments

to the pleading.   Although *pro se* pleadings represent their own challenges to the court and

counsel attempting to interpret them, those challenges multiply when, as here, the amended

complaint is a shotgun pleading.   Shotguns are not welcome in the chicken coop or in federal

pleading practice.

The Eleventh Circuit recently explained that shotgun pleadings fall into four categories,

and two are represented here:  (1) presenting claims by incorporating by reference all preceding

paragraphs of facts without specifying which facts support which claims; and (2) presenting

claims "replete with conclusory, vague, and immaterial facts not obviously connected to any

particular cause of action."  *See Weiland v. Palm Beach Cnty. Sheriff's Office,*  792 F.3d 1313,

1321-22 (11th Cir. 2015).   The Eleventh Circuit has "roundly, repeatedly, and consistently

condemn[ed]" shotgun pleading practice for years, *see Paylor v. Hartford Fire Ins. Co.*, 748

F.3d 1117, 1125 (2014).  This lengthy *pro se* Amended Complaint is a prime example of why

the Eleventh Circuit criticizes the practice as inappropriate.  Rather than accept the head-

scratching and guesswork that naturally accompanies the interpretation of a shotgun pleading,

the Eleventh Circuit encourages defense attorneys to be proactive by characterizing the

complaint as a shotgun pleading and filing a motion for more definite statement or dismissal "on

the ground that the complaint provides [the defendant] with insufficient notice to enable it to file

an answer." *Id.* at 1126-27.

Here, the Defendants did not fuss about the shotgun nature of the original or Amended

Complaint, and did not request a more definite statement.  And, while their motions do request

dismissal for failure to state a claim, their arguments focus on the merits of the claims and

require the very head-scratching about holes in the pleadings that the Eleventh Circuit's advice

was designed to avoid.

In light of the time and effort already expended in briefing, the amount of time that has

elapsed since the filing of the motion, and the fact that the Complaint has already been amended,

the court will not order *sua sponte* a more definite statement.  So, the court will first address the

federal claims.  For efficiency's sake, the court will initially address issues and claims that apply

to more than one count, and then will address the remaining federal claims.  And, the court will

shed its references to chicken-related idioms as it states and applies the law, which is a serious

and weighty business even if the subject involves a farm of feathers and chickens.

### A.  Claims that Apply to Multiple Counts[8]

#### 1.  Official Capacity Claims

In the style of the Amended Complaint, the Ethertons purport to sue the Defendants "[i]n their private and professional capacity."  To the extent that this wording represents an attempt to sue Defendants Jones, Freedman, Ledbetter, Lingerfelt, Graham, Holt, and Gibson in both their individual and official capacities, the court WILL DISMISS the claims against these Defendants in their official capacities.  The law is well-settled that "official-capacity suits ... 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'  As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Hardy v. Town of Hayneville,* 50 F. Supp. 2d 1176, 1184-85 (M.D. Ala. 1999) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (citations omitted)).  Thus, because official capacity suits are, in essence, suits against the governmental entity, and further, because the United States Supreme Court has recognized that local governments are subject to suit for monetary damages and for injunctive and declaratory relief, the Supreme Court has also recognized that official capacity suits against suable government entities are redundant and unnecessary.  *Graham*, 473 U.S. at 167 n. 14 (stating "[t]here is no longer a need to bring official-capacity actions against local government officials, for ... local government units can be sued directly for damages and injunctive or declaratory relief").

In the instant case, the Ethertons have sued the government entity involved—the City of

---

[8] The court notes that the doctrine of ripeness also applies to multiple counts; however, because the standard for ripeness varies, depending upon the type of constitutional claim asserted, the court will address that doctrine under each of the applicable constitutional claims.

Rainsville—and they have petitioned for monetary damages, not injunctive relief.  Accordingly, the court FINDS that, to the extent any official capacity claims exist and are asserted against Defendants Nick Jones, Brandon Freeman, Melissa Ledbetter, Roger Lingerfelt, Joseph Graham, David Holt, and Richard Gibson, they are redundant and unnecessary and are due to be DISMISSED.

### 2.  Claims Brought under 42 U.S.C. § 1981

In Counts 1, 2, and 3, the Ethertons state that the Defendants' actions are contrary to § 1981.  That Act prohibits discrimination on the basis of race.  42 U.S.C. § 1981.  Because the Ethertons have not stated a claim for discrimination on the basis of race, the court FINDS that any claims brought under this Act are due to be DISMISSED.

### 3.  Claims Brought under 42 U.S.C. § 1982

In Counts 1, 2, and 3, the Ethertons state that the Defendants' actions are contrary to § 1982.  That Acts states: "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."  42 U.S.C. § 1982.  In *Gomez-Perez v. Potter,* the Supreme Court explained that the "plain meaning" of the Act was to ban discrimination based on race.  553 U.S. 474, 479 (2008).  The *Gomez-Perez* decision quoted Justice Scalia's description of § 1982 as "banning public or private racial discrimination in the sale and rental of property."  *Id.* (quoting Justice Scalia's dissent in *Tennessee v. Lane,* 541 U.S. 509, 561 (2004)).

In the instant case, as discussed above, the Ethertons' amended complaint does not state a claim for discrimination based on race, and thus, the court FINDS that any claims brought under 42 U.S.C. § 1982 are due to be DISMISSED.

### 4.  Claims based on Breach of Oath of Office

In all ten counts of the Amended Complaint, the Ethertons state that Defendants should be liable for acting contrary to their Oaths of Office.  As to the federal claims raising the breach of Oaths of Office, the court is aware of no authority supporting a federal private cause of action for a state official's action contrary to his Oath of Office, unless that action otherwise violated a statute affording the plaintiff a private right of action or violated the plaintiff's constitutional rights forming the basis of a § 1983 action.  The Ethertons provide no support for any argument that a separate federal cause of action exists for such a claim.  The court FINDS that the Ethertons have failed to state a claim under federal law based on the Breach of Oath of Office and these claims are due to be DISMISSED.

### 5.  The Doctrine of Laches

The Ethertons also argue that the doctrine of laches precludes the City from applying the ordinance to their chicken farm.  They assert that they purchased the chicken farm nine years ago and operated it during the interim period without the City's objection or requirement that they go through the Special Exception process set out in the amended ordinance; thus, they argue that the City is now barred by laches from applying the amended ordinance to the chicken farm.

The court notes that in the case the Ethertons cite regarding the doctrine of laches, the Court of Appeals explained that the doctrine is used to bar a *plaintiff's* recovery where a *plaintiff's* unreasonable and inexcusable delay in bringing suit has resulted in material prejudice to a defendant.  *See Peter Letterese & Assoc. v. World Inst. of Scientology Enter.,* 533 F.3d 1287, 1321 (11th Cir. 2008); *see also Uffner v. Philip Morris USA Inc.*, 46 F. Supp. 3d 1339,

22

1349 (M.D. Fla. 2014) ("Laches is fundamentally a shield, and has no application where, as here, plaintiff attempts to use it as a sword.").   That scenario is not what faces this court, and the court FINDS the doctrine to be inapplicable.

<u>6.  Claims Based on the Unconstitutionality of § 5-2-2 of the Ordinance</u>

Originally, the Ethertons asserted that § 5-2-2 of Rainsville's Zoning Ordinance as amended was facially unconstitutional.  However, that section applies to non-conforming uses "where such use involves no permanently-fixed structure with a replacement cost exceeding $1,000 and no combination of permanently-fixed structures with a replacement cost exceeding $4,000." (Doc. 16-1, at 7).   In their latest amendment to their complaint, the Ethertons stated that the property in question had five poultry houses that were permanently-fixed structures each with a replacement cost exceeding $1,000 and that their combination exceeded $4,000.  Accordingly, they acknowledge that § 5-2-2 does not apply to the property in question, and that § 5-2-4 does.  Therefore, to the extent, if any, that the Ethertons continue to raise the unconstitutionality of § 5-2-2 in various claims, the court FINDS that they do not have standing to raise those claims, and the court will DISMISS those claims.  *See Bennett v. Spear,* 520 U.S. 154, 167-70 (1997) (setting forth constitutional and prudential standing requirements, including a causal connection between the alleged constitutional violation and the plaintiff's injury, and the likelihood that the injury will be redressed by a favorable decision); *Granite State Outdoor Adver., Inc., v. City of Clearwater, Fla.,* 351 F.3d 1112, 1116 (11th Cir. 2003) (stating as a prudential standing principle "that a party generally may assert only his or her own rights and cannot raise the claims of third parties not before the court.").

**B.  Remaining Federal Constitutional Claims**

At the outset of its discussion on the remaining individual federal constitutional claims, the court is mindful that "zoning decisions, as a general rule, will not usually be found by a federal court to implicate constitutional guarantees" and further, that federal courts are "[disinclined] to sit as a zoning board of review." *Greenbriar Village, L.L.C. v. Mountain Brook*, 345 F.3d 1258, 1262 (11th Cir. 2003).  With that guidance in mind, the court will proceed to address the remaining federal constitutional claims and to determine whether this zoning case is a rare exception to the general rule.

1.  Contract Clause

The Ethertons assert that Zoning Ordinance § 3-19-01-B violated the Contract Clause of the United States Constitution by interfering with the contract between the Ethertons and Dale and Sherrie Jones regarding purchasing the Ethertons' property. The Contract Clause of the United States Constitution provides that "[n]o State shall ... pass any ... Law impairing the Obligation of Contracts."  U.S. Const. Art. I, § 10, cl. 1.   To succeed on a claim under the Contracts Clause, a plaintiff must show that a "change in state law has operated as a substantial impairment of a contractual relationship." *Gen. Motors Corp. v. Romein,* 503 U.S. 181, 186 (1992) (internal quotation removed).  The Supreme Court explained that "[t]his inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Id.*

Here, the allegations of the Amended Complaint do not identify any contractual relationship involving one or both of the Ethertons that existed *prior to* the 2001 zoning ordinance amendment challenged, and that a change in law—the amendment— impaired.

24

Obviously, *a change in law* can only impair a contract that existed *before* the law was passed. The Ethertons pointed to their *2014 contract* with the Joneses as one that the zoning ordinance allegedly impaired.  However, the City Council passed the ordinance in question and relevant amendments to it *long before* the Ethertons and the Joneses entered into a contract.  The Ethertons do not challenge any amendments to the ordinance that the City Council passed after or contemporaneously with the 2014 contract between the Ethertons and Joneses.  Thus, the Ethertons have *not* alleged a change in law that impaired a contractual relationship existing before the change in law.  That finding in and of itself means that the Ethertons have not stated a claim under the Contract Clause.

The court also notes that a regulation or ordinance does not violate the Contract Clause as long as it serves a "significant and legitimate public purpose," and is "[based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying [the legislation's] adoption."  *Energy Reserves Group v. Kan. Power & Light Co.,* 459 U.S. 400, 411-12 (1983) (alterations in original) (internal quotation marks omitted).  So, to sufficiently allege that a zoning ordinance violated  the Contract Clause, a plaintiff must  not only state that a contract existed at the time of the enactment of the ordinance, and that the ordinance substantially impaired an obligation under that contract, but a plaintiff must also plausibly allege that the legislation was not "reasonably and necessary to serve an important public purpose." *U.S. Trust Co. of N.Y. v. New Jersey,* 431 U.S. 1, 25 (1977).  The Ethertons have not so alleged here.

For all of these reasons, the Ethertons have not stated a claim in Count 1 based on the violation of the Contract Clause in *enacting* the 2001 amendment to the Zoning Ordinance in

question. As an *alternative* ruling, to the extent that they do state a claim against the City

Council Defendants in *enacting* the 2001 amendment, those Defendants enjoy absolute

legislative immunity for legislative functions.  *See Bogan v. Scott-Harris,* 523 U.S. 44, 54-55

(1998) (finding that city officials' "acts of voting for an ordinance were, in form,

quintessentially legislative" and that absolute legislative immunity attached; the court could not

consider the motive or intent of the officials voting in determining whether their acts were

legislative).

 Further, Defendants Jones and Gibson would presumably have no role in *enacting*

legislation that would render them liable under the Contract Clause, and the amended pleadings

do not allege facts establishing such a role.

To the extent, if any,  that the Ethertons attempt to state a claim for a Contract Clause

based on the *enforcement* of the zoning ordinance as amended, that claim must fail as a matter

of law.  The Contracts Clause applies only to legislative acts; "[t]he prohibition is aimed at the

legislative power of the state, and not at the decisions of its courts, or the acts of administrative

or executive boards or officers, or the doings of corporations or individuals."  *Ross v. Oregon,*

227 U.S. 150, 162 (1913) (quoting with approval *New Orleans Waterworks Co. v. La. Sugar

Ref. Co.,* 125 U.S. 18, 30 (1888)).  "[E]nforcement of existing zoning regulations is an

executive, not legislative, act . . . 'Acts of zoning enforcement rather than rulemaking are not

legislative.'" *DeKalb Stone, Inc. v. Cnty. of DeKalb, Ga.,* 106 F.3d 956, 959 (11th Cir. 1997)

(quoting *Crymes v. DeKalb Cnty.,* 923 F.2d 1482, 1485 (11th Cir. 1991) (citations omitted)).

In sum, the Ethertons have not stated a claim as a matter of law based on a violation of

the Contract Clause of the United States Constitution.

### 2.  Equal Protection

In Count 2, the Ethertons assert that the "Defendants failed to provide the Petitioners equal protection of the secured right to contract," pointing out that the previous owners of the property conveyed the chicken farm on Kain Road to the Ethertons without objections from the City of Rainsville, but that the City treated the Ethertons differently when it raised objections to their attempted conveyance of the same property with the same use.

Defendants challenge the ripeness of the  Equal Protection Clause claims, explaining that "an equal protection challenge to a zoning ordinance is ripe for judicial review only after the state actor has made a final zoning decision."  (Ds' brief, doc. 19, at 16).  They assert that the Ethertons' failure to follow the procedure for applying for a Special Exception to the Zoning Ordinance prohibition on poultry farms means that the City's Zoning Board never had an opportunity to make a final zoning decision.  The Ethertons' respond that the ripeness doctrine does not apply because they have no obligation to comply with a facially invalid, unconstitutional ordinance and had no obligation to apply for a Special Exception.

The court finds flaws in the arguments on both sides.  The *Ethertons'* "facial invalidity" argument fails as an excuse because, as discussed previously, the zoning ordinance provision the Ethertons argue is unconstitutional, § 5-2-2, does not apply to them and they have no standing to raise that argument.  However, the *Defendants'* argument is also faulty; it misapplies the Zoning Ordinance as amended and may also fail to take into consideration the different ripeness standards, varying depending upon the type of constitutional claim.

The Defendants' argument misapplies the Zoning Ordinance because, as part of its ripeness argument, it assumes that the Zoning Ordinance as amended requires obtaining the

27

City's permission through the Special Exception process to operate a chicken farm.  The Zoning

Ordinance as amended does *not* require the institution of the Special Exception process for

*continuation* of the chicken farm as that use existed in 2001.  Rather, the chicken farm was

already in existence at the time of the 2001 Zoning Ordinance Amendment, so it was

grandfathered-in as a non-conforming use.  Further, because the chicken farm had five poultry

houses which were permanently-fixed structures whose combined replacement cost exceeded

$4,000, the chicken farm fell under non-conforming use § 5-2-4.  Contrary to the Defendants'

argument, non-conforming uses under § 5-2-4 run with the land as long as the use is not

changed, enlarged, or destroyed, and those uses may be continued even after transfer of

ownership.  The Ethertons' pleadings do not reflect that the chicken farm use has yet been

changed, enlarged, or destroyed.  Therefore, based on the facts alleged in the amended

pleadings, those purchasing the chicken farm after the Zoning Ordinance amendment in 2001

could continue the chicken farm use, without applying for a Special Exception, as long as that

use is not changed, enlarged, or destroyed.[9]

The Defendants point to § 5-2-6 to support their argument that the non-conforming use

provisions do not apply.  Again, they are mistaken about the effect of that provision.  Section 5-

2-6 begins with the language "Any use which is permitted as a Special Exception ... shall not be

deemed a non-conforming use ... but shall without further action, be deemed a conforming

use....."  (Doc. 29-1, at 31).  This provision refers to "[a]ny use *permitted* as a Special

Exception," and the court finds no ambiguity in this language and reads it as meaning a use that

---

[9] The court acknowledges that the allegations regarding the Goolesbys indicated that they may have been planning to change or enlarge the chicken farm use, and, if so, they would need to go through the Special Exception process.  However, no allegations regarding the Joneses' attempted purchase indicates that they were planning to change or enlarge that use.

has successfully gone through the Special Exception process, i.e., the granting of an application for Special Exception resulting in formal *permission* for such use.  The provision does not refer to any use listed as a *potential* Special Exception under § 4-8-2: it refers instead to a *permitted* Special Exception.  For example, if an owner wishes to enlarge a non-conforming use, or resume it after destruction or a period of disuse, the owner would need to go through the Special Exception application process, and, upon the granting of the application, those uses would no longer be non-conforming uses but would be deemed conforming uses; although lawful, the uses are no longer the same as the grandfathered-in nonconforming uses.

Indeed, any other interpretation would mean that a use listed in § 4-8-2, such as chicken farms, would be deemed a conforming use "without further action," but that reading would make no sense.  How could chicken farming be deemed a conforming use automatically without even going through the Special Exception process when the whole point of putting chicken farms on the Special Exception list is to limit and regulate their use when consistent with the provisions of the zoning ordinance and state and federal law?  Why set out a Special Exception process if those items listed as Special Exceptions automatically became a conforming use without going through that process?  The court notes that § 5-2-4 does not say that it fails to apply to uses listed in § 4-8-2 as possible Special Exceptions.  Further, if chicken farms no longer fell under the non-conformity provisions of § 5-2, then the City's statement to the Goolesbys that the Ethertons' use of the chicken farm was grandfathered-in—another term for non-conforming use—makes no sense.

And yet another reason why the City's interpretation does not make sense: if § 5-2-6 truly meant that the non-conforming use provisions did not apply to *any* chicken farms from the

time of the enactment of the 2001 zoning amendments forward— those existing before 2001 and those created afterwards—then the City should have required the Owenses and the Ethertons to apply for Special Exceptions for their chicken farm use, but the City did not.  The Amended Complaint indicates that the first time the City attempted to apply the Special Exception requirement to the Kain Avenue property was when the Ethertons were attempting to sell the chicken farm in 2014.  The actions of the City and its officials were certainly inconsistent with its current argument that § 5-2-6 rendered the non-conforming use provisions inapplicable to the Kain Avenue property beginning with the zoning amendment's enactment in 2001.

The Defendants cited three non-controlling cases, from Connecticut and Pennsylvania, in support of its argument that a municipality may amend its zoning ordinance to regulate a non-conforming use by requiring a special exception or permit to continue that non-conforming use as is: *Taylor v. Zoning Bd. of Appeals of the Town of Wallingford,* 783 A. 2d 526-532-33 (Conn. App. Ct. 2001); *Pennridge Dev. Enters., Inc. v. Volovnik,* 624 A. 2d 674, 676-77 (Pa. Comm. Ct. 1993); *Warner Co.v. Zoning Hearing Bd. of Tredyffrin Township,* 612 A. 2d 578, 585 (Pa. Comm. Ct. 1992).   This court does *not* determine in the instant case that a municipality cannot regulate a non-conforming use.  As discussed in this Memorandum Opinion, it simply determines that the specific zoning ordinance as amended applied to these specific facts results in a finding that the chicken farm use on the Kain Avenue property was a pre-existing non-conforming use to which the Special Exception process did not apply because it was grandfathered-in.  And, the non-conforming use in the instant case was indeed subject to regulation under the zoning ordinance as amended: the property owner must go through the

Special Exception process if the non-conforming use is enlarged, destroyed, resumed after disuse.  However, the pleadings in this case did not indicate that the chicken farm use had yet been enlarged, destroyed, or resumed after a period of disuse.

In sum, either the City misconstrued § 5-2-6 and/or the City misapplied § 5-2-4.  The court rejects the Defendants' interpretation of § 5-2-4 and § 5-2-6.  Section 5-2-4 applies to the chicken farm use, which the Ethertons' pleading states was in use before the 2001 amendment and is, thus, a non-conforming use that may continue as long as it is not changed, enlarged, or destroyed.  Based on the allegations in the pleadings, § 5-2-6 does not affect this ruling because, at least according to the pleadings, no Special Exception is needed to continue that use "as is" and no Special Exception has been permitted to change or resume that use.

Further, the Defendants appear to misunderstand the ripeness standard applied to equal protection claims because they focus on the Plaintiffs' failure to pursue a process: the Special Exception process.   The Eleventh Circuit has explained that challenges to a city's refusal to accommodate a property owner's zoning wishes fall into one of four categories: "just compensation, due process takings, arbitrary and capricious due process, and equal protection claims." *Eide v. Sarasota Cnty.,* 908 F.2d 716, 720 (11th Cir. 1990), *cert. denied,* 498 U.S. 1120 (1991).  For an equal protection claim and an arbitrary and capricious due process claim, finality is satisfied when the zoning decision being challenged is finally applied to the property. However, for due process takings and Fifth Amendment just compensation claims, finality is a two-pronged hurdle, requiring not only a final decision applied to the property, the first prong, but also requiring that a second prong be satisfied:  the landowner must use available state proceedings, such as the seeking of variances,  to obtain a determination on the nature and

31

extent of the permitted development.  *Id.* at 720-23.

The Eleventh Circuit requires that "to establish the ripeness of their equal protection claims, the plaintiffs must show only that the Board has made a final decision denying [the requested] zoning." *Executive 100, Inc., v. Martin Cnty.,* 922 F.2d 1536, 1541 (11th Cir. 1991). In *Executive 100,* the Eleventh Circuit found that the district court's dismissal of the equal protection claims was improper because the complaint alleged a final zoning decision even though it did not allege that the plaintiffs sought variances available; the Court of Appeals found that the failure to allege the pursuit of variances and other process justified the dismissal of the due process claims but not the equal protection claims. *Id.*

As this claim in the instant case is one for equal protection, the Ethertons must only assert that a challenged zoning decision is *finally applied* to the property.  *Executive 100,* 922 F.2d at 1541.  So, when the Defendants say that the Ethertons must establish a final decision by asserting that they have *pursued all available state processes*, such as an application for Special Exceptions, the Defendants appear to be applying the incorrect two-pronged standard.

However, even under the one-pronged standard of finality appropriate for equal protection claims, the court is not convinced that the Ethertons' claim is ripe.   The facts alleged indicate that the Ethertons and the potential purchasers of the chicken farm were asking for guidance from the City about whether the purchaser could continue chicken farm operations after the Ethertons sold it. At the time the Ethertons filed suit, they still had possession of the property, and the City had not issued a final decision preventing the Ethertons from operating the chicken farm themselves.  Rather, the Ethertons were objecting to a threat of the City's preventing chicken farm operations *in the future after sale*.  While that alleged threat may have

32

discouraged buyers and affected the Ethertons being able to sell the property, it was not a zoning decision finally applied to the property.   Therefore, the equal protection claim is not ripe and is due to be DISMISSED.

Yet, assuming *arguendo* that the determinations of the City and its officials represented a final decision within the meaning of equal protection ripeness, the court nevertheless finds, as an *alternative* ruling, that the equal protection claim is due to be dismissed on the merits.   Here, the claim is that the Defendants applied the regulation in a way that treated the Ethertons differently from others who were similarly situated, the Owenses, complaining that "the City of Rainsville raised no objections to Harold and Kathy Owens contracting and conveying .... 421 Kain [Avenue] to the Petitioners" but that in "2014, the Defendants raised objections to the Petitioners contractual conveyance ... to another party."   (Amend Compl. Doc. 16, at 51).

The court finds that the Ethertons have not stated a valid equal protection claim.   To sufficiently state an equal protection "class of one"[10] claim that does not involve strict scrutiny[11] analysis, plaintiffs must allege that the "defendants intentionally treated [them] differently from others who were *similarly* situated" and that "there was no rational basis for the disparate treatment."  *Griffin Indus. v. Irvin,* 496 F.3d 1189, 1202 (11th Cir. 2007) (emphasis in original). In such cases, the court is "obliged to apply the 'similarly situated' requirement with rigor. 'Different treatment of dissimilarly situated persons does not violate the equal protection

_____

[10]  A "class of one" claim is one "where the plaintiff did not allege membership in a class or group" but nevertheless claims that she was intentionally treated differently from others similarly situated without a rational basis for the different treatment.  *See Griffin Indus. v. Irvin,* 496 F.3d 1189, 1201 (11th Cir. 2007).

[11]  The Ethertons do not claim that the City's ordinance contained "suspect classifications" and discriminated against them because they belong to a protected class, nor do they allege that the ordinance affected "fundamental rights." *See City of New Orleans v. Dukes,* 427 U.S. 297, 303 (1976) (finding that ordinance with a grandfather clause challenged on equal protection grounds  met the rational basis test and was an economic regulation that did not implicate fundamental rights or suspect classifications).

clause.'" *Id.* at 1207 (quoting *E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)).

Here, the court finds that the allegations in the Ethertons' amended pleadings do not reflect that the two situations are similar for equal protection purposes.  First, based on the allegations of the Ethertons' pleadings as amended, the City officials stated that the Ethertons' use of the chicken farm was grandfathered-in, but that any purchasers from the Ethertons would lose their grandfathered status and would need to apply for a Special Exception.  Thus, the allegations themselves reflect that the City officials provided the reason for treating the two situations differently and that reason had nothing to do with intentional discrimination.  If the City officials were indeed wrong about the loss of grandfather status, that mistake does not support a claim of *purposeful*[12] discrimination.  *See E&T Realty,* 830 F.2d at 1114 ("Mere error or mistake in judgment when applying a facially neutral statute does not violate the equal protection clause.  There must be intentional discrimination.").

Second, the allegations do not describe two similar situations because they do not allege that the City had notice in both situations of the sale of the chicken farm and the purchasers' intent to continue that use.   The Ethertons' amended complaint does *not* state, at the time of the conveyance of the Kain Avenue property to the Ethertons, that the Defendants had notice that the Owenses were selling the farm, and/or that the Ethertons and/or Owenses contacted the Defendants, or any one of them, to discuss whether the Ethertons could continue poultry operations under the Zoning Ordinance after the sale.  The mere filing of a deed with the county

---

[12] Further, the Mayor's actions of personally meeting with Cody Etherton and offering to help negotiate the sale of the Kain Avenue property with the lender and their potential purchasers reflects no purposeful discrimination.

would not provide notice to the City of property conveyance *with continuation of the chicken farm use after purchase*.  So, as to the first conveyance, the Defendants' lack of objections means nothing without allegations that they had notice of the situation.

In contrast, when the Ethertons attempted to sell the same property, the allegations show notice to Defendants.  The people that attempted to purchase their property contacted City officials multiple times, with follow-up from the Ethertons, and the Ethertons and proposed purchasers asked for specific information about how the zoning ordinances would apply to the chicken farm use after purchase.  In this attempted conveyance, City officials received notice of the intent to convey and intent to continue the chicken farm use after conveyance, and stated that the use after conveyance would require the Special Exception process.  Applying the similarly situated requirement with rigor, the court finds, as an *alternative ruling,* that the Ethertons have not sufficiently alleged that the two situations were similar and have not stated an equal protection claim.

In their brief, the Ethertons also assert for the first time that Randy Tumlin represents a comparator; the pleadings contain no mention of Tumlin.   When ruling on a motion to dismiss, the court is limited to the allegations in the Ethertons' pleadings, which are the amended complaint (doc. 16) plus the amendment to that document (doc. 35).  The court may consider the legal arguments in the briefs but cannot consider facts stated in a brief yet not contained in the pleadings, such as those stated about Randy Tumlin.  *See Mitchell v. Thompson,* 564 F. App'x 452, 458 (11th Cir. 2014) (explaining that the Court of Appeals could not consider the additional allegations that the plaintiff raised in his response to the defendants' motion to dismiss because he did not state them in his complaint); *Skillern v. Ga. Dep't of Corrections,*

191 F. App'x 847, 849 n. 4 (11th Cir. 2006) (*per curiam*) (stating that additional allegations asserted in a brief but not alleged in the complaint were "not relevant to our review of the district court's dismissal of his complaint.").  The court notes, however, that the facts stated in the brief about Tumlin do not reflect notice to the Defendants of the transfer from Tumlin to Greer, and, when discussing the transfer, refer to lease of property use but not conveyance of property ownership, so that situation would not appear to be sufficiently similar to that of the instant case based on those abbreviated facts.

### 3.  Just Compensation Claim

In Count 8, the Ethertons assert a claim that the Defendants took their private property without just compensation, claiming a Fifth Amendment violation.  That Amendment states that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.

The Defendants challenge the ripeness of the Fifth Amendment claim.   To establish that a "just compensation" claim is ripe, "the landowner must overcome two hurdles: the final decision hurdle and the just compensation hurdle."  *Eide*, 908 F.2d at 720.  The reason for requiring a final decision is that significant factors in adjudicating a just compensation claim are "the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations," factors that "cannot be evaluated until the [city] has arrived at a final, definitive position regarding how it will apply the regulations at issue to the particular land in question."  *Williamson Cnty. v. Hamilton Bank,* 473 U.S. 172, 191 (1985).

The two-pronged final decision hurdle requires the landowner to obtain a final decision regarding the zoning ordinance's application to his property and also requires the landowner to

36

pursue available state procedures and to "seek variances from the applicable regulations." *Eide,* 908 F.2d at 721 (citing *Williamson,* 473 U.S. at 187, 191-194 (1985)). The reason behind this ripeness requirement is a practical "insistence on knowing the nature and extent of permitted development before adjudicating the constitutionality of the regulations that purport to limit it." *MacDonald, Sommer & Frates, v. Yolo Cnty.,* 477 U.S. 340, 351 (1986). In *MacDonald,* the Supreme Court found that the plaintiff's just compensation claim was not ripe after the county rebuffed its first development plan but before it had reapplied for a permit to pursue a less ambitious development plan, stating that the state courts had "le[ft] open the possibility that some development [would] be permitted, and ... le[ft] [the Supreme Court] in doubt regarding the antecedent question whether appellant's property ha[d] been taken." *Id.* at 352-53.

In the instant case, the Defendants argue that the Ethertons cannot successfully overcome the final decision hurdle because they have not applied for a Special Exception to the chicken farm zoning prohibition, and thus, have not pursued available state procedures as required to establish ripeness of their zoning claim. According to the Ethertsons' pleadings, the City never required the Ethertons to apply for a Special Exception to run the chicken farm during their own ownership because they had were grandfathered-in. As discussed previously, the issue here arises not because of a final zoning decision applied to the Ethertons but, instead, because the Ethertons and the potential purchasers were attempting to figure out in advance how zoning would apply to the property after a purchase that had not yet occurred. Under these circumstances alleged in the Ethertons' pleadings, the court cannot find that the Ethertons' claim overcomes both hurdles to render their just compensation claim ripe, and thus, this claim is due to be dismissed.

Even assuming *arguendo* that the just compensation claim is ripe, the court finds, as an *alternative* ruling, that they have failed to plead a plausible claim.  The relevant just compensation claim involving a regulatory taking[13] under the Fifth Amendment occurs when the government enacts a regulation that "denies all economically beneficial or productive use of land ... [and] is, from the landowner's point of view, the equivalent of a physical appropriation." *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015 & 1017 (1992).

To state a claim for a just compensation claim asserting a regulatory taking under the Fifth Amendment, a plaintiff must allege the following:

> First, the property owner must allege that the government action ... has denied all economically beneficial or productive use of his property.  In other words, the governmental action must have made the property worthless.

> Second, the property owner must allege either that the state law provides him no process for obtaining just compensation (such as an action for inverse condemnation) or that the state law appears to provide such process, but due to state court interpretation, the process is inadequate.

*Agripost, Inc. v. Miami-Dade Cnty.,* 195 F.3d 1225, 1231 (11th Cir. 1999) (internal quotations and citations omitted); *see also Lacy v. City of St. Petersbury, Fla.,* 608 F. App'x 911 (11th Cir. 2015) (*per curiam*) (quoting *Agripost* with approval regarding  the two necessary allegations for a "just compensation" claim).  An allegation of "diminution in property value," standing alone, does not satisfy the first element of a "just compensation" claim.  *See Penn Cent. Transp. v. City of New York,* 438 U.S. 104, 131 (1978).

In the instant case, the Ethertons have failed to allege the first element— that the

---

[13] Other types of regulatory takings occurs when regulations "compel the property owner to suffer a physical 'invasion' of his property, requiring just compensation" (*Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1015 (1992)), or when they "recharacterize as public property what was previously private property" (*Stop the Beach Nourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* 560 U.S. 702, 712 (2010)).   The instant suit includes no allegations of physical invasion or recharacterization of property.

government action has denied all economically beneficial or productive use of his property— and certainly do not state facts that would support it.  The Ethertons allege that the enforcement of the zoning ordinance prevented them from selling their property for $850,000, and resulted in foreclosure.  At the time of the first amended complaint, the foreclosure had not yet occurred, and the Ethertons were predicting that the foreclosure would result in selling the property at a "considerable discount" (doc. 16, ¶¶ 190-91), which is not the same thing as saying the ordinance rendered the property worthless.  Further, the allegations state that a home existed on the property and that the property was used for raising cattle.  Thus, as an *alternative* ruling, the court FINDS that the Ethertons have not stated a plausible just compensation claim as a matter of law, and it is due to be DISMISSED.

### 4.  Due Process Takings Claim

In Count 8, in asserting that the Defendants took their property without just compensations, the Ethertons also claim that the taking was in violation of the Fourteenth Amendment.  In one of the sections preceding the Counts, a section entitled "Violation of Due Process," the Ethertons state that the City's actions "amounted to a taking of the Petitioners' private property without due process."  (Doc. 16, ¶¶ 164-168).  For purposes of a due process claim, property interests are created and defined by "an independent source, such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Alabama state law recognizes that "an existing nonconforming use is a vested property right that a zoning ordinance may not abrogate except under limited circumstances."  *See Budget Inn of Daphne, Inc. v. City of Daphne,* 789 So. 2d 154, 159 (Ala. 2000).

The Ethertons may be asserting a "due process takings" claim, meaning that "the

application of the regulation goes so far and destroys the value of [their] property to such an extent that it has the same effect as a taking by eminent domain."  *Eide.,* 908 F.2d at 721.  The Eleventh Circuit explained the difference between the due process takings claim and a just compensation claim:

> The difference between a due process takings claim and a just compensation claim is that, for a due process takings claim, a successful suit would result in an invalidation of the local authority's application of the regulation and, perhaps, actual damages, whereas a just compensation claim is remedied by monetary compensation for the value taken.

*Id.*

To the extent, if any, that the amended pleadings also assert a due process takings claim in violation of the Fourteenth Amendment, the same ripeness standard applies as to the "just compensation" claim, and, for the same reason discussed above, that claim is not ripe and is due to be DISMISSED.

As an *alternative* ruling, the court FINDS that the amended pleadings do not state a due process takings claim; as discussed above, the facts alleged do not support any claim that the application of the regulation went so far as to destroy the value of their property and has the same effect as taking it by eminent domain.  Accordingly, to the extent that the due process takings claim is ripe, it is due to be DISMISSED for failure to state a plausible due process takings claim as a matter of law.

### 5.  Arbitrary and Capricious Due Process Claim AKA Substantive Due Process

Although the Ethertons do not assert a separate *count* complaining of arbitrary and capricious violation of due process, they use the phrase "arbitrary and capricious" repeatedly throughout their pleadings, often in connection with claims of violations of due process, and also

40

refer to violations of the Fourteenth Amendment  (*see* ¶ ¶ 155, 164-167, 181, 213).  The

Ethertons appear to be arguing that Defendants acted arbitrarily and capriciously in enforcing the

Zoning Regulation in a way that required them to apply for a Special Exception, taking their

property and impairing their contract with the Joneses.[14]

 To the extent, if any, that they attempt to assert an arbitrary and capricious due process

claim, the same ripeness standards apply to this claim as apply to the equal protection claim (*see*

*Eide.,* 908 F.2d at 720) with the same result: absent the requisite finality, the arbitrary and

capricious due process claim is due to be DISMISSED as unripe.

 As an *alternative* ruling, the court finds that the Ethertons have failed to state a claim for

arbitrary and capricious due process violation.  They continually address the arbitrary and

caprcious conduct in the context of taking their property.  To the extent that they are re-stating

their unsuccessful takings claim, the Supreme Court of the United States declared that they

cannot do so:

> The first problem with using Substantive Due Process to do the work of the
> Takings Clause is that we have held it cannot be done.  'Where a particular
> Amendment provides an explicit textual source of constitutional protection
> against a particular sort of government behavior, that Amendment, not the more
> generalized notion of substantive due process, must be the guide for analyzing
> these claims.'

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,* 560 U.S. 702, 721 (2010)

(quoting *Albright v. Oliver,* 510 U.S. 266, 273 (1994) (internal quotations omitted)).

 The Supreme Court also explained that "the 'liberties' protected by Substantive Due

---

[14] The Ethertons also allege that the Defendants acted arbitrarily and capriciously in enacting a zoning regulation that would not allow them to sell their property with the nonconforming use, but, as discussed previously, they have no standing to raise the unconstitutionality of § 5-2-2, and the section that does apply, § 5-2-4, is not facially unconstitutional; any problems exist, if at all, in its *application* to the Kain Avenue property, not its enactment.

Process do not include economic liberties." *Stop the Beach,* 560 U.S. at 721 (citing, e.g., *Lincoln Fed. Labor Union v. Northwestern Iron & Metal Co.,* 335 U.S. 525, 536 (1949)); *see also Villas of Lake Jackson, Ltd. v. Leon Cnty.,* 121 F.3d 610, 615 (11th Cir. 1997) ("There is no substantive due process 'takings' claim that would protect a specific property right not already protected by the Takings Clause."); *Bickerstaff Clay Prod. Co., Inc. v. Harris Cnty., Ga.,* 89 F.3d 1481, 1489 (11th Cir. 1996) (finding that the plaintiff's takings clause claim under the Fifth Amendment challenging the validity of a zoning ordinance subsumed the substantive due process claim, and that the plaintiff's challenge to the zoning classification lay solely under the takings clause).

To the extent that the Ethertons are re-characterizing a procedural due process claim as one for substantive due process, claiming that the City officials acted arbitrarily and capriciously in enforcing the zoning ordinance as amended, they cannot succeed with this approach, either. The Eleventh Circuit "specifically discussed the dangers of broadening the scope of substantive due process in this fashion in *McKinney* [*v. Pate,* 20 F.3d 1550, 1556 (11th Cir. 1994) (en banc) explaining that] non-legislative deprivations of state-created rights, which would include land-use rights, cannot support a substantive due process claim, not even if the plaintiff alleges that the government acted arbitrary and irrationally." *Greenbriar Village,* 345 F.3d at 1263. The Court of Appeals further explained:

> The point being that the claim that the government acted arbitrarily and irrationally can be easily subsumed and, indeed, is more properly considered a part of a claim that improper procedures were used in the deprivation. Claiming that the interest was deprived arbitrarily or irrationally is equivalent to claiming that no fair, unbiased, and meaningful procedures were used for the deprivation. That type of inquiry falls squarely within what we have defined (and clarified explicitly in *McKinney*) as a procedural due process claim.

*Id.* n. 4.

42

In both *Greenbriar Village* and *DeKalb Stone,* 106 F.3d at 959-60, the Eleventh Circuit concluded that executive action involved in the enforcement of zoning ordinances, implicating state-created property rights but not fundamental rights, could not violate the substantive due process guarantee of the Fourteenth Amendment.  *Greenbriar,* 345 F.3d at 1263-64 (affirming denial of injunctive relief challenging validity of land disturbance ordinance as to claim alleging a substantive due process violation);  *DeKalb,* 106 F.3d at 959-60 (affirming denial of  the motion for preliminary injunction to bar enforcement of zoning regulation because the cause of action pled—arbitrary and capricious deprivation of state-created property right through executive action—did not exist).

The instant case attempts to bring a claim for substantive due process based on executive action involved in the enforcement of zoning ordinances that implicated state-created property rights but not fundamental rights.  Accordingly, it does not state a claim for violation of substantive due process rights, and it is due to be DISMISSED.

### 6.  Procedural Due Process Rights

Although the Ethertons bring no separate count in the Amended Complaint explicitly asserting a violation of procedural due process, as noted previously, they repeatedly refer to violations of due process and have a section entitled "Procedural Due Process" in their brief.  A claim of procedural due process is one alleging a violation of the plaintiff's guarantee of fair procedure under the Fourteenth Amendment, brought against government actors pursuant to § 1983.

To state a plausible claim for procedural due process, plaintiffs must not only allege an initial procedural deprivation but also allege the government's refusal to provide a sufficient

procedural *remedy* for that deprivation:

> [A] procedural due process violation is not complete "unless and until the State fails to provide due process." *Zinermon [v. Burch],* 494 U.S. [113, 123 (1990)]. In other words, the state may cure a procedural deprivation by providing a later procedural remedy; only when the state refuses to provide a process sufficient to remedy the procedural deprivation does a constitutional violation action under section 1983 arise.

*McKinney,* 20 F.3d at 1557.

In the instant case,  the allegations state that the Defendants expressed their intent to apply the zoning ordinance as amended in such a way that the *purchasers* from the Ethertons would have to go through an unnecessary Special Exception process to continue a non-conforming use that ran with the land.  The allegations do not state that the Ethertons themselves received a procedural deprivation, as the Defendants allowed them to continue the chicken farm use during their ownership; the Defendants did not require the Ethertons to go through any process to continue the chicken farm use during their ownership.   The court is not convinced that such allegations state an initial procedural deprivation *on the part of the Ethertons.*  Most crucially, *they certainly do not allege the lack of a subsequent procedural remedy.*  The Ethertons have not stated a claim for a violation of their own rights to procedural due process.

The court notes that, according to the pleadings, the purchasers had a Special Exception process available which the Defendants asked them to participate in and which presumably offered a means to challenge any mistaken application—or intended mistaken application— of the zoning ordinance to them.

Accordingly, the court FINDS that any claim for procedural due process is not ripe, and *alternatively,* to the extent it is ripe, that it fails to state a claim as a matter of law.

7. Conspiracy to Interfere

In Count 3, the Ethertons assert a federal claim of conspiracy in violation of 42 U.S.C. § 1985 brought pursuant to § 1983.[15] In the "Facts Under Girding Conspiracy" section of the amended complaint, the Ethertons point to an alleged conspiracy involving the Defendants, Alabama Farm Credit, and Alabama Farm Credit's officers and attorney.[16]   Although they also assert violations of the Oath of Office, and 42 U.S.C. § § 1981 and 1982, the court has already dismissed such claims for failing to state a claim.

As to the civil conspiracy claim brought under § 1985, the Ethertons do not state which subsection of 1985 allegedly applies, but the only possible application is the third, which reads as follows:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws ....; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one of more of the conspirators.

14 U.S.C. § 1985(3).

---

[15] Section 1983 creates no substantive rights itself, but it is a vehicle for enforcing existing federal rights when a person "under color" of state law violates those federal rights.  *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 617-18 (1979).

[16] The court notes that the Defendants assert that the civil conspiracy claim is barred by the intracorporate conspiracy doctrine, but they are mistaken; a careful reading of the amended complaint reflects that the conspiracy alleged also involved Alabama Farm Credit and its officials, so the intracorporate conspiracy doctrine would not apply.

The elements of a cause of action under § 1985(3) are

(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Childree v. UAP/GA CHEM, Inc.,* 92 F.3d 1140, 1146-47 (11th Cir. 1996).  The second element

"requires a showing of some 'racial, or perhaps otherwise class-based invidiously discriminatory

animus behind the conspirators' action.'" *Id.* (quoting *United Bhd. of Carpenters& Joiners of*

*Am., Local 610 v. Scott,* 463 U.S. 825, 829 (1983)).

In the instant case, the Ethertons' pleadings as amended do not meet the second element

because they are devoid of racial or otherwise class-based invidiously discriminatory animus.

Accordingly, the court FINDS that the conspiracy claim under § 1985 is due to be DISMISSED.

### 8.  "Neglect to Prevent" Claim Brought Pursuant to 42 U.S.C. § 1986

In Count 4, entitled "Neglect to Prevent," the Ethertons allege that the individual

Defendants refused to act and/or speak when "Richard Gibson unlawfully interjected himself into

the Petitioners' private contractual relations" and that they had a legal and moral duty to protect

the Petitioners property rights "to the contractual conveyance of the lawful use, peaceable

possession and occupancy of their private property to another party."  (Amend. Compl., Doc. 16

at 53).

In the case of *Park v. City of Atlanta,* the Eleventh Circuit Court of Appeals explained

that "Section 1986 claims are [ ] derivative of § 1985 violations . . . . The text of § 1986 requires

the existence of a § 1985 conspiracy . . . . Section 1986 requires only that [defendants] knew of a

§ 1985 conspiracy and, having the power to prevent or aid in preventing the implementation of

46

the conspiracy, neglected to do so. "  120 F.3d 1157, 1160 (11th Cir. 1997).

With this guidance in mind, because the Amended Complaint fails to state a § 1985 claim, then Plaintiffs' claim under § 1986 necessarily fails.  Accordingly, the "neglect to prevent" claim in Count 4 is due to be DISMISSED.

### 9.  Breach of Fiduciary Duty, Fraud, Breach of Contract, and Intentional Interference Claims Brought Pursuant to § 1983

In Counts 5 (entitled "Breach of Fiduciary Duty") 6 (entitled "Constructive Fraud"), 7 (entitled "Breach of Contract"), 9 (entitled "Intentional Interference with Contractual Relationship"), and 10 (entitled "Intentional Interference with Business Relationship), the Ethertons assert that those claims are in violation of Article 1 Section 10 of the United States Constitution, Defendants' Oath of Office and brought pursuant to § 1983.  It identifies no other federal rights violated.  The court has already dismissed claims based on violation of the Contract Clause in Article 1 § 10 and the Defendants' Oath of Office.  Because § 1983 creates no substantive rights, claims brought pursuant to § 1983 must identify a separate *federal* right violated.  These claims identify no separate *federal* right, and thus, fail to state a claim upon which relief can be granted pursuant to § 1983.

### 10.  Qualified Immunity

As another *alternative* ruling  applied to the individual Defendants, the court FINDS that, to the extent the Amended Complaint states valid, plausible federal claims, qualified immunity applies to all individual Defendants as to each of those federal claims.  Qualified immunity offers protection from suit for government official sued in their individual capacities if they were acting within the scope of their discretionary authority when the conduct occurred and if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  The court FINDS

that, based on the allegations of the Amended Complaint, each of the individual Defendants was

acting within the scope of his discretionary authority when the act(s) occurred that allegedly

violated federal statutory and federal constitutional law.  The court further FINDS that to the

extent, if any, that the allegations do state a valid, plausible claim or claims against any

individual Defendant regarding his violation of federal statutory or federal constitutional law, the

violation was *not* clearly established at the time of the alleged violation.

### 11.  State Law Claims

As the court has dismissed all *federal* claims, it chooses, in its discretion, *not* to exercise

supplemental jurisdiction of the state law claims asserted in this case; the court will DISMISS

without prejudice those state law claims as well.

Dated this 19th day of October, 2015.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE